J-A13029-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| K.G. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| E.D. | |
| Appellee | No. 2982 EDA 2013 |

Appeal from the Order entered September 27, 2013
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2011-05320

| | |
|---|---|
| K.G. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| E.D. | |
| Appellant | No. 3128 EDA 2013 |

Appeal from the Order entered September 27, 2013
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2011-05320

BEFORE: ALLEN, J., MUNDY, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED DECEMBER 30, 2014**

Cross-Appellants, K.G. (Mother) and E.D. (Father), both appeal from

the September 27, 2013 order granting them shared legal and physical

_____

[*] Former Justice specially assigned to the Superior Court.

custody of their daughter, G.D. After thorough review, we reverse and remand for further proceedings.[1]

We summarize the relevant factual and procedural history of this case as follows. In September 2009, Mother and Father met on the dating website Match.com. Trial Court Opinion, 11/27/13, at 4. At the time the parties met, Father's marital status was listed as divorced in his site profile. *Id.* at 4, 8-9. Despite this listing, Father was in fact married to M.D. (Wife). *Id.* at 4-5, 9. Mother and Father began dating in September 2009. *Id.* at 9. In the spring of 2010, Mother became pregnant with G.D., who was subsequently born in December of 2010. *Id.* at 5, 9. Father's name was not listed on G.D.'s birth certificate. *Id.* at 5-6.

In late-January 2011, Mother signed adoption paperwork prepared by Father's attorney. *Id.* at 6, 8, 10. In doing so, Mother executed her consent to the adoption of G.D. by Father and Wife. *Id.* at 8, 10-11. Father subsequently obtained physical custody of G.D. from Mother on February 27, 2011. *Id.* at 7, 11.

On March 2, 2011, Father and Wife filed a petition to confirm Mother's consent to G.D.'s adoption and a petition for Wife's adoption of G.D. On

_____

[1] By unpublished memorandum, on August 15, 2014, this Court remanded this matter and retained jurisdiction for the trial court to file a supplemental opinion, addressing its factual determinations underlying its entire custody finding. *See **K.G. v. E.D.**,* --- A.3d --- (Pa. Super. 2014) (unpublished memorandum). The trial court filed its supplemental opinion with this Court on September 26, 2014.

March 7, 2011, Mother filed a *pro se* petition to revoke her consent to G.D.'s adoption. Mother alleged she executed this consent due to the fraud and/or duress of Father. **See** Trial Court Opinion, 11/27/13, at 2; Mother's Complaint for Emergency Custody, 3/7/11, at ¶ 7. Also on March 7, 2011, Mother filed a *pro se* emergency custody petition. Within this filing, Mother alleged G.D. was living in Maryland with Father and Wife, and that Father was denying Mother contact with G.D. Mother's Complaint for Emergency Custody, 3/7/11, at ¶ 7. Father subsequently filed a motion to stay the custody action pending the outcome of the adoption action, which the trial court granted on March 25, 2011.

On May 27, 2011, the trial court issued an agreed-upon temporary custody order. This temporary order granted Father primary physical custody of G.D. and Mother partial physical custody of G.D. on alternating weekends. Trial Court Opinion, 11/27/13, at 2; Temporary Order, 5/26/11, at 2-5. This order was to remain in effect until the conclusion of the orphans' court action. Temporary Order, 5/26/11, at 4-5.

Following a four-day hearing, the orphans' court granted Mother's petition to revoke her consent to G.D.'s adoption on or around October 12, 2011. The orphans' court concluded the consent had been procured by fraud and duress. **See** Trial Court Opinion, 11/27/13, at 2. The orphans' court dismissed, with prejudice, Father and Wife's petition to confirm consent and petition for adoption. **Id.** at 2-3. By a separate order, the

orphans' court directed the May 27, 2011 temporary custody order to remain in full force and effect pending further order of court. Trial Court Order, 10/13/11.

Father and Wife appealed the orphans' court order to this Court. *See In re Adoption of G.D.*, 50 A.3d 245 (Pa. Super. 2012) (unpublished memorandum), *appeal denied*, 53 A.3d 51 (Pa. 2012). Due to the pending appeal, the trial court stayed all further custody proceedings by order dated December 14, 2011. The trial court directed that the May 27, 2011 temporary custody order would remain in full force and effect during the pendency of Father and Wife's appeal.

While awaiting our disposition of that appeal, Father filed two emergency petitions seeking an order enjoining Mother from disclosing the details of the custody and orphans' court litigations. Father's Emergency Petition to Enjoin, 1/24/12; Father's Emergency Petition to Enjoin, 2/16/12. Mother also filed an emergency petition to correct and/or clarify the order of court and for appointment of Guardian Ad Litem (GAL). Mother requested that the temporary order be corrected to grant her shared legal custody. Mother's Emergency Petition, 4/25/12, at 4.[2]

By memorandum filed on May 18, 2012, this Court affirmed the October 12, 2011 orphans' court order. *See G.D.*, *supra*. On June 12,

---

[2] We note that Mother's petition does not contain pagination. Therefore, we have assigned each page a sequential page number for ease of reference.

2012, Mother filed a petition to lift the stay in the custody action and for an immediate hearing. However, Father and Wife filed a petition for allowance of appeal with our Supreme Court on June 18, 2012. *Id.* Our Supreme Court denied that petition on July 17, 2012. *Id.*

Following a conference on Mother's emergency petition to correct and/or clarify the custody order, the trial court granted Mother and Father shared legal custody on July 31, 2012. Trial Court Order, 7/31/12, at ¶ 1. The trial court subsequently listed this matter for trial. Trial Court Order, 8/2/12 at 1. The trial commenced on March 25, 2013, and continued through March 26, April 25-26, June 3-5 and 10-11, August 5, 7, 9, and 12-14, 2013. At trial, Mother and Father's testimony differed significantly. *See* Trial Court Opinion, 11/27/13, at 4-11.

Following this protracted custody proceeding, the trial court granted Mother and Father shared legal and physical custody on an alternating weekly basis. Trial Court Order, 9/27/13, at 8. The trial court directed Mother and Father to attend co-parenting counseling "until such time as the counselor deems it no longer necessary, or, until further order of the Court." *Id.* at 10. By this order, the trial court also denied Father's petitions to enjoin Mother from disclosing the details of the orphans' court litigation and the custody matter on the Internet, to the media, or to any other third party. *Id.* at 11.

On October 24, 2013, Mother filed a timely notice of appeal. Mother failed to file a concise statement of errors complained of on appeal with this notice. *See* Pa.R.A.P. 1925(a)(2)(i) (providing that a concise statement of matters complained of on appeal shall accompany a notice of appeal in a children's fast track case). On October 29, 2013, the trial court directed Mother to file her concise statement within twenty-one days; Mother timely complied with that order. Because no party claims prejudice resulted from Mother's failure to file a concise statement with her notice of appeal and because Mother timely complied with the trial court's order, we will not quash or dismiss her appeal. *See In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that an appellant's failure to strictly comply with Pa.R.A.P. 1925(a)(2)(i) did not warrant an application of the waiver rule, as no court order had been violated, and there was no prejudice to any party).

On November 7, 2013, Father filed a timely notice of cross-appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). *See* Pa.R.A.P. 511 (stating, "[t]he timely filing of an appeal shall extend the time for any other party to cross appeal"); Pa.R.A.P. 903 (providing, "if a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was served[ ]"). The trial court subsequently filed its Rule 1925(a) opinion on November 27, 2013. Following remand by this Court,

the trial court filed its supplemental opinion on September 26, 2014. **See**

***K.G. v. E.D.***, --- A.3d --- (Pa. Super. 2014) (unpublished memorandum).

On appeal, Mother raises the following issue for our review.

> [I.] Should the child custody order appealed from be reversed where the statutory factors in 23 Pa.C.S.[A.] § 5328[(a)] do not support the custody determination, and the trial court's findings of fact and conclusions of law are unsupported by the record?

Mother's Brief at 3. Additionally, Father raises the following three issues for

our review.

> I. Should the [c]hild custody order appealed from be reversed where the statutory factors in 23 Pa.C.S.[A.] § 5328[(a)] do not support the custody determination by the [t]rial [c]ourt, and the [t]rial [c]ourt's findings of fact and conclusions of law are unsupported by the record[?]
>
> II. Should the [c]hild custody order appealed from be reversed when the [t]rial [c]ourt committed prejudicial error in excluding evidence offered by [Father] concerning Mother's son and how Mother raised and cared for her son[?]
>
> III. Should the [c]hild custody order appealed from be reversed when the [t]rial [c]ourt abused its discretion in failing to enjoin Mother from disclosing the details of the [a]doption and [c]ustody matters on the [I]nternet, to the media or to any person or entity not associated with the [c]ustody or [a]doption matters[?]

Father's Brief at 1.

The scope and standard of our review in custody matters is as follows.

- 7 -

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. … However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. … Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (parallel citations omitted).

- 8 -

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004).

Instantly, because the custody trial commenced in March 2013, the Child Custody Act (Act), 23 Pa.C.S. §§ 5321–5340, is applicable. *See* *C.R.F. v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012) (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply). Section 5328 of the Act provides an enumerated list of factors a trial court must consider in determining the best interests of a child when awarding any form of custody.

### § 5328.  Factors to consider when awarding custody

**(a)** **Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's

household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3)   The parental duties performed by each party on behalf of the child.

(4)   The need for stability and continuity in the child's education, family life and community life.

(5)   The availability of extended family.

(6)   The child's sibling relationships.

(7)   The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)   The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)   Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)   Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)   The proximity of the residences of the parties.

(12)   Each party's availability to care for the child or ability to make appropriate child-care arrangements.

> (13)   The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
>
> (14)   The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15)   The mental and physical condition of a party or member of a party's household.
>
> (16)   Any other relevant factor.

23 Pa.C.S.A. § 5328(a)(1)-(16).[3]

This Court has stated that, "**[a]ll** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." **J.R.M. v. J.E.A.**, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

> [In addition,] Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." **C.B. v. J.B.**, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013).

---

[3] The Act was amended, effective January 1, 2014, to include an additional factor at 23 Pa.C.S.A. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services).

***A.V.***, ***supra*** at 822-823. With these standards in mind, we turn to the merits of this appeal.

Mother argues that the trial court abused its discretion by not granting her sole legal and primary physical custody of G.D. Mother's Brief at 51. The crux of her argument is that the trial court failed to properly consider and apply the evidence involving Father's act of fraudulently procuring the adoption consent in fashioning its custody order. Father similarly argues that the trial court erred and abused its discretion by not granting him sole legal and primary physical custody of G.D. Father's Brief at 48-49, 54. Both parties contend that the trial court's conclusions of law lack support within its factual findings and that the trial court did not properly apply the Section 5328(a) factors. Mother's Brief at 51; Father's Brief at 54. Specifically, Mother contests the trial court's conclusions as to Section 5328(a)(1), (2), (8), (11), and (13), while Father contests the conclusions as to Section 5328(a)(1), (2), (3), (4), (8), (10), (11), and (13). Mother's Brief at 52-59; Father's Brief at 54-63.

Upon agreement of the parties, the trial court admitted into evidence the orphans' court order granting Mother's petition to revoke her consent to G.D.'s adoption, this Court's memorandum affirming the order, and our Supreme Court's denial of Father's petition for allowance of appeal. N.T., 3/25/13, at 8-9, 11. In addition to this documentary evidence, Mother and Father testified with respect to the procurement of the adoption consent and

the way Father came to exercise sole physical custody of G.D. from February 27, 2011 until the May 27, 2011 temporary order, and sole legal custody until the July 31, 2012 temporary order. The trial court aptly set forth Mother's and Father's testimony, which differed significantly, in its November 27, 2013 Rule 1925(a) opinion, and we adopt it herein. *See* Trial Court Opinion, 11/27/13, at 4-11. Notably, Father testified he does not agree with the orphans' court finding that he fraudulently procured the adoption consent. He stated, "I don't agree with it, but I am abiding by it." N.T., 6/5/13, at 176.

With respect to Mother's argument that the trial court failed to properly consider and apply the evidence involving Father's act of fraudulently procuring the adoption consent in fashioning its custody order, the trial court responded that it considered the above-described documentary evidence, but failed to find the evidence relevant to its best interest analysis pursuant to Section 5328(a). Trial Court Opinion, 11/27/13, at 16-18; Trial Court Opinion, 9/26/14, at 2-3. The trial court reasoned that it "is not in a position to 'redress' any purported wrongs which [the orphans' court] found had occurred in the procurement of the adoption consent." Trial Court Opinion, 11/27/13, at 18. Rather, the trial court explained that it "strictly limited" its determination "to a custodial arrangement which would be in the best interest of the child … ." *Id.*; Trial

Court Opinion, 9/26/14, at 3. Upon thorough review, we are constrained to conclude that the trial court abused its discretion.

In addressing Section 5328(a)(10), which states the trial court must consider "[w]hich party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child[,]" the trial court found that Mother's "limited involvement in the child's life is [not] indicative in any way that she is less likely to attend" to G.D.'s needs. Trial Court Opinion, 9/26/14, at 13. Significantly, the trial court based this finding on "the circumstances of how [ ] Father came to be in the position of being the primary caretaker, specifically, based on a consent to adopt which was later found to be fraudulently obtained by [ ] Father." *Id.* Further, the trial court rejected as not credible all of Father's testimony alleging that Mother is incapable of providing for G.D.'s daily needs. *Id.* at 13-14.

Nevertheless, the trial court failed to apply the evidence of Father's fraudulent procurement of the adoption consent to its analysis of Section 5328(a)(1), which looks at which party is more likely to encourage and permit frequent and continuing contact between the child and another party. Further, the trial court failed to properly apply the evidence that Father exercised sole physical custody from February 27, 2011, to May 27, 2011, without Mother's consent.

In its September 26, 2014 supplemental opinion, the trial court acknowledged that Father "unilaterally limit[ed]" Mother's contact with G.D.

- 14 -

from February 27, 2011, until the May 27, 2011 temporary physical custody order. Trial Court Opinion, 9/26/14, at 5. However, the trial court excused Father's action because the orphans' court "had not yet rendered a decision on the accompanying adoption matter at that time, and based on the Consent to Adopt signed by both parents, [ ] Father had full legal and physical custody of the child until the May 2[7], 2011 agreed order was issued." *Id.* at 6. Therefore, the trial court found Father's action of limiting Mother's contact with G.D. was "not indicative that [he] is incapable of permitting and encouraging frequent contact between the child and [ ] Mother to a degree which would permit the court to deny him shared physical custody of the child." *Id.* The trial court determined that both parties have demonstrated they are able to permit and encourage frequent and continuing contact. Order, 9/27/13, at 3.

We conclude the trial court abused its discretion in excusing Father's behavior in unilaterally limiting Mother's contact with G.D. in light of the competent record evidence that Father fraudulently procured the adoption consent that resulted in the orphans' court litigation. As such, we hold as unreasonable the trial court's conclusion that Father is able to permit and encourage frequent and continuing contact between G.D. and Mother.

Additionally, we conclude the trial court abused its discretion to the extent it based its conclusion under Section 5328(a)(1) on Mother having consistently exercised partial custody on alternating weekends pursuant to

- 15 -

the May 27, 2011 temporary order. The competent record evidence reveals that the May 27, 2011 temporary physical custody order, as well as the July 31, 2012 temporary legal custody order, resulted from the trial court's intervention, at Mother's request, for her custody rights. Moreover, although Mother exercised her partial physical custody consistently since the temporary order was entered, conflict and chaos has dominated the parties' dealings, including at the time of custody exchanges. Mother aptly summarized the extensive testimonial evidence in this regard as follows.

> Father and [Wife] did everything in their power to ensure that Mother received only the bare minimum amount of visitation directed by the court, including obstructing the [custody] exchanges with frivolous requests, withholding medical information, failing to provide clothing for the child, … refusing additional visitation even when they were too ill or occupied to care for G.D. and were frequently using daycare, videotaping and shouting [during] the [custody] exchanges ….
>
> …
>
> Father admitted to hiring private investigators to follow Mother, [her boyfriend], and other people Mother knows. He acknowledged that he allowed his sister … to use information he provided to attack Mother on the [I]nternet ….
>
> …
>
> Father testified that he does not consult Mother on G.D.'s school, church, activities, or relocation, and that they fight and do not get along when it comes to G.D., although he claims that he wants to co-parent with Mother. Mother confirm[ed] Father's lack of communication on these issues. Father and [Wife] claimed that Mother consented to [their]

- 16 -

> relocation to Delaware, but disregarded their move to Maryland in early 2011, claiming simply that Mother knew they had a house there. Father and [Wife] accuse Mother of bad parenting, and claim that she does not show any interest in G.D. [Wife] … called Mother a prostitute, accused her of having STD's, accused her of engaging in drugs, lesbian sex, and threesomes, and claimed that she had sex with old men and men at the massage parlor,[4] making these accusations at least once in front of [Mother's boyfriend] and the children,[5] as well as on the Internet.

Mother's Brief at 24, 33, 38 (internal citations omitted).

Our review of the testimonial evidence confirms the above summary and reveals Father and Wife's animosity toward Mother throughout the underlying custody proceedings and trial. The relationship between the parties is so acrimonious that, in the July 31, 2012 temporary order granting Mother shared legal custody, the trial court directed that neither Mother, Father, nor Wife "were to participate in the exchange of the custody of the child. Third party designees were to exchange the child inside the police

_____

[4] Mother testified that, in approximately 2009, she worked at a massage parlor that required her to conduct topless massages. Mother quit the job but subsequently returned to it because she needed work. She last worked at the massage parlor in January of 2010, nearly one year before G.D.'s birth, and she has not returned. **See** Mother's brief, at 10; **see also** N.T., 3/25/13, at 24-27; N.T., 6/4/13, at 8. Mother testified that, for the last three years, she has been employed at a motel as an accounting manager. N.T., 3/25/13, at 27.

[5] In addition to G.D., Mother has one son from a prior relationship, who was age seven at the time the custody trial commenced. Mother has sole custody of her son.

stations in Whitemarsh Township, [in Montgomery County, Pennsylvania] and Odessa, Delaware." Trial Court Opinion, 11/27/13, at 3. The trial court ordered that Mother, Father, and Wife "shall remain in their vehicles at all times during the exchange of custody." Trial Court Order, 7/31/12 at 1. Further, the trial court ordered that there "shall be no videotaping of the exchange of custody of the Child inside either police station." *Id.* at 1. Mother testified that, prior to the July 31, 2012 temporary order, Father and Wife videotaped the custody exchanges. Specifically, Mother testified as follows.

> Q. Now, you received an Order, July 3[1], 2012, that indicated there would be no videotaping at the exchanges. Has videotaping continued?
>
> A. It has, but they're in their car videotaping. [The order] says that there's no videotaping … in the police station[.] So, the way around it is to videotape from the car. So they would videotape – I could see the videotape camera in their car, videotaping the exchanges. Through the window.

N.T., 3/25/13, at 251.

Moreover, Father continues to deny that he fraudulently procured the adoption consent from Mother, and that he unilaterally limited Mother's contact with G.D. Even a review of Father's brief to this Court demonstrates the contention and hostility that exist, with Father arguing that Mother is the one who is incapable of permitting frequent and continuing contact between G.D. and him, and that he should be awarded primary physical custody, although the record is devoid of any evidence favoring him in this regard.

Father's Brief at 54-56. Based on the foregoing, we hold the trial court's findings with respect to Section 5328(a)(1) are not supported by the competent record evidence, and its conclusions are unreasonable.

With respect to Section 5328(a)(8), which looks at the attempts of a parent to turn the child against the other parent, the trial court found "no credible evidence that either parent has attempted to turn the child against the other parent." Order, 9/27/13, at 4. To the contrary, Mother argues the following.

> Father and [Wife] may not be engaged in overt, active attempts to turn G.D. against Mother, but they are engaged in a far more sinister and subtle method of doing so; isolation. They are acting to keep G.D. from Mother, so that she forgets Mother, comes to view her as a stranger, and on her own becomes less comfortable with Mother. But for the court order in place to thwart them[,] it is certain [Father and Wife] would be far more aggressive in their efforts to keep Mother from G.D.

Mother's Brief at 57.

On February 27, 2011, when Father first started to limit Mother's contact with G.D., G.D. was an infant of two months. Mother testified that, after she filed the petition to revoke the adoption consent, but before the hearing in that matter, the orphans' court and counsel for the parties agreed Mother should have visitation with G.D. N.T., 3/25/13, at 131. Mother testified that Father would only agree to visits between Mother and G.D. if he supervised them, and two such visits occurred in May of 2011. *Id.* at 131-132. During the second supervised visit, while Mother was holding G.D.

- 19 -

on her lap, Mother testified that Father stated to her, "I would like to work something out …. Let my wife adopt your baby." **Id.** at 137. Mother testified that when she refused, Father became angry, and tried to pry G.D. from her arms. **Id.** at 138. She went on to testify that Father was holding her down on the chair and that he was in her face yelling and threatening to "blackmail" her about her past employment. **Id.** at 138. The altercation became so heated that Wife came into the room and removed G.D. from the middle of the situation. **Id.** at 139. Father then physically pushed Mother out the door of the house while continuing to scream after her. **Id.**

As a result of this incident, Mother filed a Protection From Abuse (PFA) petition on May 16, 2011, and the trial court issued a temporary PFA order granting her full custody of G.D. Mother testified Father was never served with that order, and, therefore, she did not obtain temporary custody of G.D. **Id.** at 137-139. The PFA hearing occurred on May 26, 2011, and Mother agreed to settle the PFA dispute with Father by accepting unsupervised partial physical custody of G.D. on alternating weekends. **Id.** at 157. Thus, the agreed upon May 27, 2011 temporary physical custody order was issued under these circumstances.

As such, from the time G.D. was five months old through the custody trial, at which time G.D. was two years old, G.D. has been in Mother's physical custody only on alternating weekends, while Father and Wife have been her primary caretakers. Despite Mother's requests for additional

custody time on holidays and at other specific times, Father has never agreed to any time beyond what was granted to Mother in the May 27, 2011 temporary order.  N.T., 3/25/13, at 171-172, 176-178.  We conclude that, for the first two years of G.D.'s life, Father succeeded in deliberately isolating G.D. from Mother.  This inevitably caused any bond and relationship, which this small child is entitled to have with her Mother, to suffer.  This naturally manifested in G.D. favoring Father as the more familiar parent.  Therefore, we are constrained to conclude that the competent record evidence does not support the trial court's finding under Section 5328(a)(8) that neither parent has attempted to turn the child against the other parent.

With respect to Section 5328(a)(11), the proximity of the residences of the parties, there is no dispute that the parties live a driving distance of approximately one and a half hours.[6]  The trial court acknowledged that the parties do not live in close proximity to each other and that this may present an obstacle, but concluded that this factor does not outweigh "the benefits of the importance of a shared physical custody for the child's best interests." Trial Court Opinion, 9/26/14, at 16.  We hold the trial court's conclusion unreasonable because it requires G.D., then age two, to undergo a three-hour roundtrip car ride each week between homes.

---

[6] Mother resides in Plymouth Meeting, in Montgomery County, and Father resides in the State of Maryland.

Based on the foregoing, we conclude the trial court abused its discretion in failing to weigh Section 5328(a)(1), (8), and (11) in Mother's favor. Moreover, to the extent the trial court based its custody decision upon the presumption that a shared physical custody arrangement is in G.D.'s best interest, we conclude that it committed an error of law.

> [C]ourts may no longer reason by presumption in child custody cases. Not only has the tender years presumption been explicitly repudiated, but so have all other presumptions. In a custody dispute between parents, no one has the burden of proof; no presumption may be resorted to; instead, the court must determine according to the evidence in the particular case before it what will serve the children's best interests.

*In re Custody of Temos*, 450 A.2d 111, 121-122 (Pa. Super. 1982) (citations omitted).

Upon thorough review, we conclude the competent evidence of record does not support a shared physical custody award. Accordingly, we reverse the order with regard to the award of shared physical custody, and direct that Mother shall have primary physical custody of G.D. *See M.A.T. v. G.S.T.*, 989 A.2d 11, 21 (Pa. Super. 2010) (*en banc*) (stating that, where the record is sufficiently developed, we may substitute our judgment for that of the trial court and decide the case on the merits).

Based on the foregoing, we likewise conclude that the trial court abused its discretion in granting the parties shared legal custody. The Act defines "legal custody" as "[t]he right to make major decisions on behalf of

the child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S.A. § 5322. Section 5328(a)(13) addresses the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. In this case, the trial court found "there is a level of conflict between the parties." Trial Court Order, 9/27/13, at 6. Specifically, the trial court stated as follows.

> [The trial court] has concerns as to the level and quality of communication between Mother and Father, however, the [trial c]ourt does not find these concerns significant enough to bar a shared custody arrangement as both parties have demonstrated a willingness and ability to communicate in promoting the child's best interests ….

*Id.* at 7.

Upon review, we conclude that the competent evidence of record does not support the trial court's finding that the legitimate concerns about the level and quality of the parties' communication are not significant enough to bar a shared custody arrangement. In the trial court's September 26, 2014 supplemental opinion, it reasoned, in part, "with the assistance of co-parent counseling, both parents should be able to learn to communicate more effectively for the best interests of the child." Trial Court Opinion, 9/26/14, at 18. We disagree based on the record evidence. Indeed, Mother testified that she and Father "do not communicate at all." N.T., 3/25/13, at 218. Rather, Mother testified she believes it is Wife who corresponds with her in e-mails regarding G.D. *Id.*

We conclude it is in G.D.'s best interest to grant Mother sole legal custody until such time that the situation between the parties were to improve. Accordingly, we reverse the order with regard to the award of shared legal custody, and direct that Mother shall have sole legal custody of G.D. **See M.A.T.**, **supra**.

Mother also requests this Court to award her counsel fees and costs associated with the instant appeal, such as this Court awarded her in connection with Father's appeal from the orphans' court order. **See Adoption of G.D.**, **supra**. In support of her request, Mother sets forth the following argument.

> Father and [Wife] engaged in the same misconduct here – indeed, they even continue to give the same statements and testimony already adjudicated as perjury in the Orphans' Court case – as they did in the prior proceeding. This Court has already determined that Father's prior misconduct warranted an award of fees. His persistent engagement in that same misconduct in this case warrants the same result. They had 12 witnesses (Mother had 6) and managed to drag out this custody case for over 14 days, as the record will reflect, as well as filed numerous petitions.

Mother's Brief at 60-61.

Pennsylvania Rule of Appellate Procedure 2744 provides as follows.

> **Rule 2744. Further Costs. Counsel Fees. Damages for Delay**
>
> In addition to other costs allowable by general rule or Act of Assembly, an appellate court may award as further costs damages as may be just, including

- 24 -

<blockquote>
(1)    a reasonable counsel fee and

(2)    damages for delay at the rate of 6% per annum in addition to legal interest,

if it determines that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious.  The appellate court may remand the case to the trial court to determine the amount of damages authorized by this rule.

…
</blockquote>

Pa.R.A.P. 2744.

Further, this Court has explained our standard of review.

<blockquote>
In determining the propriety of such an award, we are ever guided by the principle that an appeal is not frivolous simply because it lacks merit.  Rather, it must be found that the appeal has no basis in law or fact.  This high standard is imposed in order to avoid discouraging litigants from bringing appeals for fear of being wrongfully sanctioned.
</blockquote>

***Griffith v. Kirsch***, 886 A.2d 249, 255-256 (Pa. Super. 2005), *quoting*

***Menna v. St. Agnes Med. Ctr.***, 690 A.2d 299, 304 (Pa. Super. 1997)

(citations omitted).

In this appeal, we discern no basis to award Mother reasonable attorney fees and costs where Mother filed an appeal from the custody order, and Father filed a cross-appeal.  Father's cross-appeal is not frivolous or taken solely for delay.  Although a panel of this Court deemed Father's conduct in the orphans' court litigation to be "dilatory, obdurate, or vexatious," we are not persuaded Father's conduct rises to the same level

here where both he and Mother are dissatisfied with the custody order and filed appeals. Therefore, we deny Mother's request for reasonable attorney fees and costs.

With respect to Father's cross-appeal, we observe that the trial court thoroughly analyzed his issues in its November 27, 2013 Rule 1925(a) opinion. In his first issue, Father argues the trial court abused its discretion in failing to weigh the foregoing statutory factors in his favor. Specifically, Father alleges that Mother has failed to communicate with him regarding G.D., that she has made the custody exchanges chaotic, and that she has filed false abuse charges against him. Father alleges that G.D. has returned from Mother's custodial weekends with injuries, including "excessive bruising, a bump on her head[,] and a black eye. Something happened almost every weekend Mother had [G.D.]." Father's Brief at 56. In addition, Father alleges that Mother failed to provide the necessary care for G.D. while in her custody, and that G.D. "would return from Mother's weekends with behavior issues." *Id.* at 57.

The trial court concluded that all of Father's allegations were misplaced and/or not credible and not supported by the evidence. We conclude the record evidence overwhelmingly supports the trial court's analysis of Father's first issue on appeal. Thus, we discern no abuse of discretion. As such, we adopt the trial court's November 27, 2013 Rule 1925(a) opinion as

dispositive of Father's first issue. *See* Trial Court Opinion, 11/27/13, at 25-36.

In his second issue, Father argues the trial court committed an error of law by precluding testimony regarding Mother's care of J.G., her then seven-year-old son from a prior relationship, who is G.D.'s half-brother. Father argues this testimony was relevant to the trial court's consideration of Section 5328(a)(3), (4), (9), (10), and (12).

When faced with a question of the admissibility of evidence, our standard of review is very narrow. Because this decision is committed to the discretion of the trial court, we may reverse only upon a showing of an abuse of discretion or error of law. *Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72 (Pa. Super. 2006). "[T]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Id.*

In its November 27, 2013 Rule 1925(a) opinion, the trial court stated that Mother "testified as to G.D.'s sibling relationship with J.G., the childcare arrangements she has made for her son, his schooling, his relationship with her family, and his lack of contact with the biological [f]ather." Trial Court Opinion, 11/27/13, at 24. Otherwise, the trial court stated "there was no proffer of any relevant information as to J.G. which the court should have considered with regard to the best interest of G.D." *Id.* at 24-25. We discern no abuse of the trial court in this regard. Further, Father does not

state on appeal what additional information regarding J.G., if any, was relevant to this custody matter. It follows that Father does not assert how he was prejudiced by the trial court's preclusion of additional testimonial evidence regarding J.G. As such, we discern no abuse of discretion or error of law by the trial court.

In his third issue, Father argues the trial court erred in failing to enjoin Mother from disclosing the details of the orphans' court litigation and the custody matter on the Internet, to the media, or to any other third party. Father argues it is in the best interest of G.D. to maintain privacy in these matters, and that G.D.'s privacy trumps Mother's guarantee of freedom of speech under the Pennsylvania and United States Constitution.

The trial court set forth the following background with respect to this issue, which is supported by the testimonial evidence

> There was testimony presented at trial that [ ] Mother published the details of her custody dispute with [ ] Father on a website, and, a video presented that she gave interviews to news organizations as well …. [ ] Mother testified that[,] "I wanted the story out there so [G.D.] would know her mother fought for her …[.] I also thought this would help my case."

Trial Court Opinion, 11/27/13, at 32-33 (citation to record omitted). Significantly, the trial court noted that, "[t]here was also evidence presented at trial that [ ] Father's sister … started a website and also posted information about the adoption and custody cases, including negative statements made about [ ] Mother." *Id.* at 38. Moreover, Father admitted

- 28 -

on direct examination that he provided his sister with information posted on the website. *See* N.T., 6/5/13, at 194-195. In any event, Mother testified she does not plan to initiate any additional media coverage. *See* N.T., 6/3/13, at 290-291.

Father cites *In the Interest of M.B. and J.B.*, 819 A.2d 59 (Pa. Super. 2003), in support of his argument that "the privacy rights of the child are more important than the right of free speech, when failure to protect the child's rights would result in harm to the child." Father's Brief at 67. In that case, the Pittsburgh Post-Gazette newspaper appealed from the trial court's order denying its motion to open juvenile dependency proceedings. We held as follows.

> [W]hile there is a rebuttable constitutional presumption that juvenile dependency proceedings are open to the public, our courts possess an inherent power to control access to their proceedings and may deny access when appropriate. Once an interested party seeks access, however, the party seeking to keep the proceedings closed may rebut the presumption of openness by demonstrating that: (1) closure serves a compelling governmental interest, and (2) no less restrictive means to serve that interest exists.

*In the Interest of M.B. and J.B.*, *supra* at 60. We found that "the parties seeking closure have demonstrated a compelling interest in protecting the privacy of the minor children and that no less restrictive means than total closure exists." *Id.* As such, we affirmed the order.

Father's reliance on ***In the Interest of M.B. and J.B.***, is misplaced in this case which did not involve the press seeking access to the custody proceedings. Herein, the trial court specifically found that "based on … Mother's testimony that no movie deal or further media coverage was forthcoming, and no evidence to the contrary being submitted by … Father, the [trial] court did not abuse its discretion in not 'enjoining' … Mother from pursuing what amounts to speculative endeavors." Trial Court Opinion, 11/27/13, at 38. Therefore, for all the foregoing reasons, Father's issues on appeal fail.

Accordingly, we reverse the custody order with regard to the shared legal and physical custody award. We remand this matter to the trial court to fashion a new custody order granting Mother sole legal and primary physical custody, and setting forth a partial physical custody schedule for Father that is in G.D.'s best interest.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/30/2014

- 30 -

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

K. G.

V.

E. D.

SUPERIOR COURT DOCKET NO.
2982 EDA 2013
3128 EDA 2013

LOWER COURT DOCKET NO.
2011-05320

## OPINION

**COONAHAN, J.**                         **November 27, 2013**

Plaintiff, K. G. , (hereinafter "Plaintiff Mother") and Defendant,

E. D. , (hereinafter "Defendant Father") are the parents of G.D.

(hereinafter "the child"), who was born December 28, 2010. On March 2, 2011,

Defendant Father filed a Petition for Adoption in the Orphan's Court Division of the

Court of Common Pleas of Montgomery County, Orphan's Court docket 2011-

A0058. On March 7, 2011, Plaintiff Mother filed an Emergency Complaint for

Custody in the Family Division of the Court of Common Pleas of Montgomery

County requesting, inter alia, full custody of the child. On March 22, 2011,

Defendant Father filed a Motion to Stay Plaintiff Mother's Emergency Complaint for

Custody due to the pending adoption proceedings in Orphan's Court. On March 25,

2011, after conference with the Honorable Stanley R. Ott, Administrative Judge of

the Orphan's Court Division of the Court of Common Pleas, Montgomery County,

this court granted Defendant Father's March 22, 2011 petition and the custody

proceedings were stayed pending resolution of the Orphan's Court proceedings.

On May 16, 2011, Plaintiff Mother filed a petition for protection from abuse

on behalf of herself and the child against Defendant Father. On May 16, 2011, a


2011-05320-0105    FilingID:    9538966
11/27/2013 1:35:57 PM
Opinion
Receipt #Z1982235    Fee    $0.00
Mark Levy - MontCo Prothonotary

temporary protection from abuse order was granted which, inter alia, ordered no contact between Defendant Father and the child, and awarded temporary full custody of the child to Plaintiff Mother pending the outcome of a final hearing on the protection from abuse petition. On May 18, 2011, after conference with Judge Stanley R. Ott, the court issued an order reconsidering Plaintiff Mother's March 7, 2011 Emergency Complaint for Custody and lifted the March 25, 2011 Stay of Proceedings.

On May 26, 2011, at a Protection from Abuse proceeding before the Honorable Kelly C. Wall, Plaintiff Mother and Defendant Father entered into a temporary custody agreement which gave Plaintiff Mother partial physical custody of the child every other Friday at 7:00 p.m. until Sunday at 7:00 p.m. Custody transfer of the child on Friday was to take place at the Whitemarsh Police Station in Montgomery County, Pennsylvania, and custody transfer of the child on Sunday was to take place at the Odessa Police Station in Odessa, Delaware. Communication was restricted to occur between Plaintiff Mother and Defendant Father's wife, M.D.

Plaintiff Mother and M. D. were to communicate by email for the purpose of communication concerning the custody transfers, and, in the event of an emergency, they were to communicate by cell phone. The May 26, 2011 agreement was made an order of the Court on May 27, 2011. On May 27, 2011, the temporary protection from abuse order was stricken by the court.

After hearing, on October 12, 2011, Judge Ott ordered under the Orphan's Court docket number 011-A0058 that the consent for adoption executed by Plaintiff Mother on or about January 27, 2011 was procured by "fraud and duress practiced by birth father E. D. and said consent is hereby revoked." The October

2

12, 2011 order stated that Defendant Father's petition to confirm consent was denied and dismissed with prejudice, and that Defendant Father's outstanding petition for adoption was dismissed with prejudice. On October 12, 2011, Judge Ott issued a separate order stating that the Orphan's Court matter was resolved by the above order, and the May 27, 2011 temporary custody agreement pursuant to the Protection from Abuse docket number 2011-13342 was to remain in full force and effect pending further order of the Family Court Judge.

On November 14, 2011, Defendant Father filed an appeal of the Orphan's Court decision to the Superior Court of Pennsylvania. On December 14, 2011, this court issued an order stating that the custody proceedings were stayed due to the pending appeal in the Orphan's Court Division of the Court of Common Pleas.

On April 25, 2012, Plaintiff Mother filed an Emergency Petition to Correct and/or Clarify Order of Court and for Appointment of Guardian Ad Litem. On May 18, 2012, the Superior Court of Pennsylvania affirmed Judge Ott's October 12, 2011 order. On June 12, 2012, Plaintiff Mother filed a Petition to Lift Stay and for Immediate Hearing. On June 18, 2012, Defendant Father filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court. This petition was denied on July 17, 2012.

On July 30, 2012, after consideration of Plaintiff Mother's April 25, 2012 petition, this court issued an order which, inter alia, granted the parties shared legal custody of the child, and ordered that effective August 3, 2012, neither Mother, Father, not Father's wife M. D.          were to participate in the exchange of the custody of the child. Third party designees were to exchange the child inside the police stations in Whitemarsh Township, and Odessa, Delaware.

3

On August 2, 2012, upon consideration of the June 12, 2012 Petition to Lift Stay and for Immediate Hearing, and after conference with the parties, this court issued an order directing the Montgomery County Court Administrator's Office, who handled this court's scheduling, to list the custody proceeding for a protracted hearing.

On March 25, 2013, this court began a protracted hearing on custody.[1] Plaintiff Mother was represented by Cheryl Sattin, Esquire, and Defendant Father was represented by Deidre Agnew, Esquire. Plaintiff Mother testified that she has two children, G.D. and an older son, J.G. who was seven years old at the time of the hearing. Plaintiff Mother testified that she has had several jobs over the years, including bartending, retail management, accounting management, and for a period of approximately six months in 2009, she worked at a "massage parlor" where she would occasionally perform sexual acts for some of the customers.[2] N.T. March 26, 2013 at 25-26.

Mother testified that she met Defendant Father on the dating website, Match.com in September, 2009. Plaintiff Mother presented evidence that at the time they met, Defendant Father's profile page on Match.com listed his marital status as "divorced". N.T. March 26, 2013 at 32-33. Plaintiff Mother also testified that Defendant Father told her he was "fully divorced" when they met. March 25, 2013 N.T. at 35. Plaintiff testified that in March, 2011 she first learned that

---

[1] The custody hearing in this matter occurred over fifteen days from March, 2013 until August, 2013. There are over 4,000 pages of testimony from eighteen witnesses which have been transcribed. Due to the volume of the hearing record, the court shall only summarize the testimony of the parties as it relates to the history between them which led up to the filing of Plaintiff Mother's March 7, 2011 Complaint for Custody. Any other testimony cited in the opinion shall be done as the court's addresses the parties' purported errors as stated in their respective 1925(b) statements.

[2] Mother testified that prior to 2009, she worked at the same "massage parlor" "for a brief period of time" but quit. N.T. March 25, 2013 at 24.

4

Defendant Father was in fact married. Plaintiff Mother testified that when she met Defendant Father, he told her his first name was "Ed", and he would sign his emails to her "Ed" or "Edward", and he told her that his last name was DuPont. N.T. March 25, 2013 at 36-37.

Plaintiff Mother testified that she and Defendant Father began dating and in April, 2010, Plaintiff Mother became pregnant. Plaintiff Mother testified that at first, Defendant Father was "angry" about the pregnancy, and he encouraged Plaintiff Mother to have an abortion. N.T. March 25, 2013 at 50. Plaintiff Mother eventually made an appointment to get information about an abortion, however, Defendant Father then changed his mind, telling Plaintiff Mother "he would agree that I could have the baby...only if I would allow him to make the rulings for [G.D.]...he would basically be the primary custodian...but I would still be her Mother." N.T. March 25, 2013 at 52. Plaintiff mother testified that termination of her parental rights was never discussed.

Plaintiff Mother testified that she and Defendant Father continued to date during the pregnancy, and that she believed that they would live together after the baby was born. Plaintiff Mother testified that Defendant Father did not attend any doctor's appointments with her during the pregnancy. He did attend a baby shower given for Plaintiff Mother by her family and friends. Plaintiff Mother testified that the parties also communicated about the pregnancy "all the time" by telephone, in person, and in text messages. N.T. March 25, 2013 at 56.

On December 28, 2010, Plaintiff Mother gave birth to the child. Defendant Father was not present for the birth, but he came to the hospital the following day. N.T. March 25, 2013 at 72. Plaintiff Mother testified that when she filled in the

5

birth certificate, she wrote Defendant Father's name down, however his social security number was required, and he would not give her the number. "[S]o he was never on the first birth certificate." March 25, 2013 at 74.

Plaintiff Mother testified that she and Defendant Father discussed marriage after the child's birth. N.T. March 25, 2013 at 80. Plaintiff testified that in January and February, 2011 Defendant Father would visit her and the child "at least two to three times a week" and would stay "a couple of hours, at least, every time." N.T. March 25, 2013 at 84. At the end of January, 2011, Plaintiff mother testified that Defendant Father gave her a document that he said his lawyer had prepared "so he could claim his rights as the Father of [the child]".[3] N.T. March 25, 2013 at 85. Plaintiff Mother stated she saw the word "adoptee" on the document and asked Defendant Father about this. Plaintiff Mother testified that Defendant Father told her it was to add his name to the birth certificate, and so that he could add the child to his health insurance, but that "I would always be her mother." N.T. March 25, 2013 at 86. Plaintiff Mother testified that she did not understand the document, but they "went over it very briefly, he told me what it was and I believed him." N.T. March 25, 2013 at 86-87. A few days later, Plaintiff Mother signed the document and returned it to Defendant Father. She stated that she continued to date Defendant Father after she signed the document. Plaintiff Mother stated that she and Defendant Father decided that after she returned to work at the end of her maternity leave, he would take the child during the work week to his house in Delaware where he would have a nanny take care of her while he worked from home. Plaintiff Mother would then have the child on the weekends and could come

---

[3] This document was a Consent of Birth Parent Form, marked as trial exhibit M-7.

down and see the child "whenever I wanted, until we moved in together." N.T. March 25, 2013 at 82.

Plaintiff Mother testified that a week or two before the end of her maternity leave, on February 27, 2011, Defendant Father asked to take the child for the night for a "trial run" and to have the child get used to the nanny. N.T. March 25, 2013 at 93. Plaintiff Mother stated she initially was hesitant because "I was taking care of her, I was breast feeding her." N.T. March 25, 2013 at 93. She testified that "he wanted to make sure it would work out what we had planned. So I said, 'That's fine, you can take her for a trial.' He promised he would bring her back Tuesday." N.T. March 25, 2013 at 93.

Plaintiff Mother testified that when the following Tuesday came, Defendant Father did not return the child to her in Pennsylvania. On Wednesday she stated she told Defendant Father "You are going to let me see my daughter...this is too long, I can't be without her for this amount of time." N.T. March 25, 2013 at 93-94. Plaintiff Mother testified that on Thursday she went to Defendant Father's house in Delaware. She testified that she told Defendant Father she wanted to bring the child home with her, and that he said no. She stated that he told her he would bring the child up to Pennsylvania on Friday, and Plaintiff Mother agreed "because he wasn't allowing me to take [the child] with me." N.T. March 25, 2013 at 99.

Plaintiff Mother testified that on Friday, Defendant Father did not return the child to Pennsylvania, and that she called him "numerous" times that day but he was "making excuses". N.T. March 25, 2013 at 101. On Saturday Plaintiff Mother testified that "eventually he stopped answering me. I kept calling him, texting him,

7

he just disappeared. I got really upset and scared, because I didn't know what was going on." N.T. March 25, 2013 at 102. Plaintiff Mother testified that she and her friend, E.D.            , began "looking things up...on computer searches" and they found "numerous connections between Defendant Father and a woman named M. D.            . N.T. March 25, 2013 at 103. Plaintiff Mother testified that eventually she was able to reach Defendant Father and they arranged to meet the following day in Maryland.

The parties met the following day, Sunday, at a restaurant in Maryland and Plaintiff Mother stated that Defendant Father told her he was married, but he and his wife had an "open relationship" and they could do whatever they wanted. N.T. March 25, 2013 at 107. Plaintiff Mother testified when she asked Defendant Father what was going on, "he said 'Oh the paperwork you actually signed, was actually so M. D.  could adopt G. D.    .' And I said are you kidding me...that's not what you told me...I would never agree to that...you know I would never give her to your wife." N.T. March 25, 2013 at 108. Plaintiff testified that Defendant Father told her it was "too late now. Everything is finalized. You had thirty days and that's up, so basically you have no rights." N.T. March 25, 2013 at 108. Plaintiff Mother left Maryland without the child, and after consulting with an attorney, she filed the revocation of the adoption paperwork and the emergency custody petition on March 7, 2011.[4]

Defendant Father testified that when he joined Match.com in 2004, he listed his status as "divorced" because he was divorced from his first wife, not because he

---

[4] As previously stated in this opinion, on October 12, 2011, Judge Ott issued an order for the Orphan's Court proceeding under docket 2011-A0058 which revoked the consent to adopt, denied Defendant Father's petition to confirm consent, and dismissed with prejudice Defendant Father's petition for adoption.

8

was divorced from M.D.                , his second wife. N.T. June 5, 2013 at 74. Defendant Father testified that although he was separated from his wife, M.D.    , he had a business relationship with her, and "we had a personal relationship, we were talking, we were amicable." N.T. June 5, 2013 at 77. When asked by Ms. Sattin if he agreed with his testimony from the Orphan's Court proceeding on September 21, 2011 where he stated that in 2008 "I was going just to date other people, and she was open to date other people if she wanted to, and that's the arrangement we came up with", Defendant Father replied : "Yes."

Defendant Father testified he identified himself on Match.com as E.D., meaning E.D.            , and that he did not give people he met online his real name at first  because "I do a lot of business from New York to Virginia, and I just didn't feel comfortable giving my name, I really didn't." N.T. June 5, 2013 at 87. Defendant Father testified that when he first met Plaintiff Mother he did not know that she was working at the "massage parlor" and he only learned of it "six or seven months later". N.T. June 5, 2013 at 93.

Defendant Father testified that he began dating Plaintiff Mother in September of 2009. He stated that the child was conceived in March of 2010. Prior to Plaintiff Mother becoming pregnant, Defendant Father stated that he "tried to stop seeing her...I tried to pull away from the relationship..." N.T. June 10, 2013 at 35. Defendant Father testified that in April or May, 2010 when he was reconciling with his wife, M.D.   , he told M.D.   about Plaintiff Mother, but that he did not tell her that Plaintiff Mother was pregnant. N.T. June 5, 2013 at 143.

Defendant Father testified that after he and Plaintiff Mother found out that she was pregnant, "we came to the agreement that we had about [the child]. She

9

wanted to get an abortion, and I didn't want to do that....I made her a proposal, why don't you let me raise the child by myself instead of aborting it." N.T. June 10, 2013 at 36. Defendant Father testified that his wife, M.b., participated in the adoption later because Plaintiff Mother found out "...that if someone is terminating someone's parental rights, that person that's giving up that parental right, someone else has to fill that person's shoes in order to do that." N.T. June 10, 2013 at 73. Defendant Father testified that Plaintiff Mother eventually agreed with his suggestion to allow M.b. to take her place as the child's Mother. N.T. June 10, 2013 at 74.

Defendant Father testified that due to the agreement he had with Plaintiff Mother concerning the adoption of the child by Defendant Father and his wife, his attendance at the baby shower and his participation in the selection of the child's name was a "charade" that he had to go through. Defendant Father testified that Plaintiff Mother was misleading her family as to the true nature of the parties' relationship and the pregnancy. N.T. June 5, 2013 at 151.

Defendant Father denied that Plaintiff Mother signed the adoption consent paperwork due to any fraudulent behavior on his part, and that she did so willingly and by agreement. Defendant Father testified that he told his wife M.b. about Plaintiff mother's pregnancy in September of 2010, and the she was "very upset." N.T. June 5, 2013 at 158. Defendant Father testified that by November, 2010, after starting the reconciliation process with M.b. , they discussed adopting the child from Plaintiff Mother. Defendant Father stated that at the time, he and M.b. believed that she could not have any children biologically. N.T. June 5, 2013 at 160.

10

Defendant Father testified that after the child was born, he filed the consent to adopt paperwork after Plaintiff Mother signed it, and then he took custody of the child on February 27, 2011 pursuant to the agreement he had with Plaintiff Mother. Defendant Father testified that he does not agree with Judge Ott's finding that the adoption consent was obtained by fraud. Defendant Father stated:"...I don't agree with it, but I am abiding by it. I respect what he did." N.T. June 5, 2013 at 176.

After fifteen days of hearings, on September 27, 2013, the court entered a final custody order in this matter which, inter alia, gave the parties shared legal custody of the child and gave the parties shared 50/50 physical custody of the child. The September 27, 2013 Order also stated, inter alia, that the parties are to attend co-parenting counseling "forthwith", and are to continue with co-parenting counseling "until such time as the counselor deems it no longer necessary, or, until further order of the Court." September 27, 2013 Order at 10.

On October 24, 2013, Plaintiff Mother filed a Notice of Appeal to the Superior Court of Pennsylvania of the September 27, 2013 Order. On October 25, 2013, Plaintiff Mother filed an Amended Notice of Appeal to the Superior Court of Pennsylvania wherein Plaintiff Mother states that this matter is a children's fast track appeal. On October 28, 2013, the court issued an Order directing Plaintiff Mother to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa. R.A.P. 1925 (b) within twenty one (21) days of the date of the Order. On October 28, 2013, Plaintiff Mother filed an Amended Notice of Appeal to the Superior Court of Pennsylvania. The October 28, 2013 Amended Notice of Appeal incudes a Request for Transcript. On October 28, 2013, Plaintiff Mother filed a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P.

11

1925(b). The court notes that ten (10) of the fifteen (15) days of trial Notes of Testimony had been transcribed and filed with the Montgomery County Prothonotary's Office prior to both parties filing their respective Notices of Appeal to the Superior Court of Pennsylvania. One additional day of Notes of Testimony for the August 9, 2013 hearing was transcribed and filed with the Montgomery County Prothonotary's Office after Plaintiff Mother filed her Notice of Appeal, but prior to Defendant Father filing his Notice of Appeal. Plaintiff Mother's Concise Statement of Matters Complained of on Appeal states as follows:

> "1. The Trial Court abused its discretion in finding that Father has demonstrated that he is able to permit and encourage frequent and continuing contact between the child and the other party particularly in light of the overwhelming evidence to the contrary, including but not limited to, a) the findings of the Orphan's Court and of the Superior Court in the matter regarding Father's procurement of a fraudulent consent to adopt, and b) Father's (and his family's ) course of conduct designed to minimize Mother's involvement with the child both in the form of physical custody and relating to her ability to share in decision making relating to the child."

> "2. The Trial Court abused its discretion in finding that there was "no credible evidence that either parent has attempted to turn the child against the other parent" given the overwhelming evidence to the contrary including but not limited to, a) the findings of the Orphan's Court and of the Superior Court in the matter regarding Father's procurement of a fraudulent consent to adopt, and b) Father's (and his family's) course of conduct designed to minimize Mother's involvement with the child both in the form of physical custody and relating to her ability to share in decision making relating to the child and to alienate Mother from the child."

> "3. The Trial Court abused its discretion in failing to award to Mother primary physical custody in light of the improper conclusions drawn as to Custody Factors 1, 8, and in failing to properly weigh and consider factors 2,11 and 13 of 23 Pa.C.S.A. §5328(a)."

12

On November 6, 2013, the Superior Court of Pennsylvania designated this matter as a "Children's Fast Track" appeal. On November 7, 2013, Defendant Father filed a Notice of Cross-Appeal to the Superior Court of Pennsylvania from the custody order entered September 27, 2013, and a Statement of Matters Complained of on Cross-Appeal pursuant to Pa.R.A.P. 1925(b). Defendant Father's Statement of Matters Complained of on Cross-Appeal pursuant to Pa.R.A.P. 1925(b) states as follows:

> "1. The Trial Court committed prejudicial error in excluding evidence offered by Cross-Appellant, including but not limited to evidence concerning how Mother raised and cared for her son (not the child at issue in this case), the medical care (or lack thereof) provided to her son, child care decisions for her son, and all other evidence concerning Mother's son."

> "2. The Trial Court abused its discretion in finding that Mother demonstrated that she is able to permit and encourage frequent and continuing contact between the child and Father particularly in light of the overwhelming evidence to the contrary, including but not limited to, a) Mother's failure to properly communicate with Father about issues concerning the child and other issues, b) Mother's (and her family's and friend's) consistent course of conduct to turn exchanges and other contact into chaotic events in front of the child, and c) Mother's attempts to bring false abuse charges against Father on three occasions, in Pennsylvania, Maryland, and Delaware and the lying about it repeatedly under oath and otherwise to try to use it to her advantage before the Trial Court."

> "3. The Trial Court abused its discretion in finding that there is no continued risk of harm to the child by Mother or by any member of Mother's household, given the overwhelming evidence to the contrary, including but not limited to, a) the repeated and excessive bruising and other injuries (i.e., burned lips, black eye) suffered by the child while in Mother's care, b) the numerous rashes and

13

illnesses suffered by the child as a result of being in the care of Mother, c) the behavior of the child after returning from Mother's care such as hitting, head butting, cursing, and problems with sleep, and d) the evidence that Mother was oblivious about the child's fevers, bruising, injuries, and illnesses."

"4. The Trial Court abused its discretion in finding that Mother has provided the necessary care of the child while in Mother's custody, in light of the overwhelming evidence to the contrary, including but not limited to, a) Mother's failure to provide proper medical care for the child during the first two months of her life and at other times, and b) Mother's failure to properly care for or supervise child resulting in excessive bruising and other injuries to the child and illnesses suffered by the child."

"5. The Trial Court abused its discretion in finding no credible evidence that Mother has attempted to turn the child against Father, given the overwhelming evidence to the contrary, including but not limited to, a) Mother's website, Facebook pages, and other online presences, and b) Mother's media coverage both online and on television, that all set forth false and untrue statements about Father, and disclosed confidential Orphan's Court matters, which portray Father in an extremely negative light and which child will be able to see as she gets older and is able to read and get online."

"6. The Trial Court abused its discretion in finding that the child is doing well physically and emotionally while under the care of Mother and in finding that Mother is able to attend to the daily physical, emotional, developmental, educational and special needs of the child in light of the overwhelming evidence to the contrary, including but not limited to, a) the repeated and excessive bruising and other injuries (i.e. burned lips, black eye) suffered by the child while in Mother's care, b) the numerous rashes and illnesses suffered by the child as a result of being in the care of Mother, c) the behavior of the child after returning from Mother's care such as hitting, head butting, cursing, and problems with sleep, , d) the evidence that Mother

14

was oblivious about the child's fevers, bruising, injuries and illnesses, e) Mother's failure to provide proper medical care for the child during the first two months of her life and at other times, f) Mother's failure to properly care for or supervise child resulting in excessive bruising and other injuries to the child and illnesses suffered by the child, and g) Mother's instability in where she lives, insufficient sleeping arrangements for the child at Maternal Grandmother's home, her many boyfriends, her job history, problems with her brother (and his criminal, violent and drug history) and problems with Mother's son's Father (and his criminal and violent history)."

"7. The Trial Court abused its discretion in failing to award Father primary physical custody of the child for the aforementioned reasons and the improper conclusions drawn as to the custody factors 1,2,3,4,8,10 under 23 Pa.C.S.A. § 5328 (a)."

"8. The Trial Court abused its discretion in failing to properly weigh and consider custody factors 11 and 13 under 23 Pa.C.S.A. § 5328(a) when entering its Order, given that the parties live at least 1 and ½ hours apart and that this has been such an extremely high-conflict case."

"9. The Trial Court abused its discretion in failing to enjoin Mother from disclosing the details of the Adoption and Custody matters on the internet, to the media or to any person or entity not associated with the Custody or Adoption matters, in light of the overwhelming evidence that it would not be in the child's best interest, as much of what Mother disclosed or published were false and untrue statements about Father, and disclosed confidential Orphan's Court matters, which portrayed Father in an extremely negative light. Mother also had future plans for more media and a movie deal, in which child's life would be exposed for all to witness."

This opinion is filed pursuant to and is in compliance with Pa. R.A.P. 1925 (a) and addresses both Plaintiff Mother's and Defendant Father's issues on appeal.

15

The standard of review of a custody order is very narrow; the appellate court is limited to determining whether the trial court committed a gross abuse of discretion. See Yates v. Yates, 963 A.2d 535 (Pa. Super. 2008). When reviewing an appeal from a custody order, the appellate court should not substitute its judgment for that of the trial court; the appellate court merely decides if the conclusions of the trial court involve an error of law or are unreasonable in light of its factual findings. Hanson v. Hanson, 878 A.2d 127, 129 (Pa. Super. 2005). Although there is no presumption favoring shared custody, the courts possess the authority to award shared custody. Smith v. Smith, 307 Pa.Super. 544, 453 A.2d 1020 (1982). Shared custody may be awarded when both parents are fit, both parents are seen by the child as sources of security and love, and both parents are able to communicate and cooperate in promoting the child's best interests. Wiseman v. Wall, 718 A.2d 844 (1998); In re Wesley J.K., 299 Pa.Super. 504, 445 A.2d 1243 (1982).

First, the court addresses Plaintiff Mother's claims as follows:

> "1. The Trial Court abused its discretion in finding that Father has demonstrated that he is able to permit and encourage frequent and continuing contact between the child and the other party particularly in light of the overwhelming evidence to the contrary, including but not limited to, a) the findings of the Orphan's Court and of the Superior Court in the matter regarding Father's procurement of a fraudulent consent to adopt, and b) Father's (and his family's ) course of conduct designed to minimize Mother's involvement with the child both in the form of physical custody and relating to her ability to share in decision making relating to the child."

At the beginning of trial in the custody matter, counsel for both parties addressed the issue of transcripts, orders and findings from the 2011 Orphan's

16

Court trial before Judge Ott, and the orders and findings issued from the Superior Court of Pennsylvania and the Supreme Court of Pennsylvania as related to Defendant Father's appeal of the Orphan's Court decision. The following parameters discussed by counsel for both parties and the court in a pretrial conference regarding the Orphan's Court proceedings and the appeals therefrom were memorialized as follows on the first day of the custody record:

> Ms. Sattin: "Orders, findings, and opinions of Judge Ott, arising out of the 2011 hearing relating to Mother's petition to revoke adoption consent are admissible in this proceeding, subject to any relevant objection...and that this would also be the case for the Superior Court and Supreme Court orders, findings, and opinions, which relate to Father's appeal of Judge Ott's order....the transcripts of testimony of the witnesses from the 2011 [adoption revocation] hearing...will not be accepted into evidence in total, but can be used for cross examination and impeachment purposes...and the court shall have the discretion to weigh this evidence as Your Honor deems appropriate"
>
> Ms Agnew: "...I just want to make it for the record, that you are not bound by the credibility determination of these prior findings." N.T. March 25, 2013 at 8-9.

Plaintiff Mother's claim that the findings of the Orphan's Court and of the Superior Court of Pennsylvania in the adoption matter were part of the "overwhelming evidence" presented at the custody trial, and that these findings, as well as the outcome of the adoption matter should have played a significant part in the court's determination as to custody is incorrect.

In reaching a decision in this custody matter, the court took into consideration the ruling of Judge Ott in the adoption matter, the decision of the Superior Court of Pennsylvania denying Defendant Father's appeal of the adoption

17

ruling, and the denial by the Supreme Court of Pennsylvania of Defendant Father's Petition for Allowance of Appeal. However, the court was not bound by the specific findings of Judge Ott in terms of credibility of the parties, witnesses, or a redetermination of facts as the case was presented in Orphan's Court. The Orphan's Court proceeding addressed the issue of Plaintiff Mother's consent or lack of consent to adopt G.D. by E.D. The custody matter before this court addressed the best interests of the child, G.D. As stated by this court on the first day of trial:

> The Court: "It was a different inquiry in front of Judge Ott...it's not the same for me. My inquiry is the best interest of the child...so he had a different job to do, a different focus, a different responsibility really than I have...[the orders and findings] they do exist, they can come in...the relevancy, the weight...is what I put on to it. Certainly not in regard to credibility, I make my own credibility findings."
> N.T. March 25, 2013 at 124, 126.

It appears that in part of Plaintiff Mother's Pa R.A.P 1925 (b) statement of errors 1 and 2, Plaintiff Mother believes that because of the results of Judge Ott's Orphan's Court order, this court was to focus only on those proceedings and rule against Defendant Father for that reason. This court is not in a position to "redress" any purported wrongs which Judge Ott found had occurred in the procurement of the adoption consent. This court's determination was strictly limited to a custodial arrangement which would be in the best interest of the child and did so by assessing the factors enumerated in 23 Pa.C.S.A. § 5328(a)(1) through (a)(16) which states as follows:

> (a) Factors.- In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

18

(1)Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

19

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

Plaintiff Mother's statement that the findings and ruling of the Orphan's Court and decision of the Superior Court of Pennsylvania regarding Father's procurement of a fraudulent consent to adopt constitute part of the "overwhelming" evidence which should determine the best interests of the child is misplaced and erroneous.

Plaintiff Mother states that Defendant Father's (and his family's) course of conduct was "designed to minimize Mother's involvement with the child both in the form of physical custody and relating to her ability to share in decision making relating to the child" and, therefore, the court abused its discretion in finding that Defendant Father has demonstrated that he is able to permit and encourage frequent and continuing contact between G.D. and Plaintiff Mother. Plaintiff Mother does not specify what "course of conduct" was designed by Defendant Father, or his family, to "minimize Mother's involvement with the child". If Plaintiff Mother is referring to Judge Ott's findings in the Orphan's Court proceeding, the court did consider Judge Ott's decision among all of the evidence presented at the custody hearings but his decision is not dispositive of a custody determination as stated earlier in this opinion. Nor does Plaintiff Mother specify what time frame she is referring to, or whether she is referencing Father's conduct prior to or concerning the consent to adopt. Plaintiff Mother's statement in paragraph 1 is simply a self-serving conclusion without any supporting evidence from the record. "It is the appellant's

20

responsibility to precisely identify any purported errors". Schenk v. Schenk, 880 A.2d 633 (Pa. Super.2005). "When the trial court has to guess what issues a defendant is appealing, that is not enough for meaningful review." Commonwealth v. Dowling, 778 A.2d 683. 686 (Pa. Super. 2001). "In other words, a concise statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no concise statement at all." Dowling, 778 A.2d at 686. Therefore, the court submits that paragraph 1 of Plaintiff Mother's Statement is inadequate to merit appellate review, and Plaintiff Mother has waived any alleged error by the court. Pa.R.A.P. 1925(b)(4)(vii).

> "2. The Trial Court abused its discretion in finding that there was "no credible evidence that either parent has attempted to turn the child against the other parent" given the overwhelming evidence to the contrary including but not limited to, a) the findings of the Orphan's Court and of the Superior Court in the matter regarding Father's procurement of a fraudulent consent to adopt, and b) Father's (and his family's) course of conduct designed to minimize Mother's involvement with the child both in the form of physical custody and relating to her ability to share in decision making relating to the child and to alienate Mother from the child."

As stated previously in this opinion, Plaintiff Mother misstates the weight to be given and the purpose of the evidence presented at the custody trial as to the orders and findings of the Orphan's Court and of the Superior Court of Pennsylvania. Plaintiff Mother does not specify what "course of conduct" was designed by Defendant Father, or his family, to "turn the child" against Plaintiff Mother. Nor does Plaintiff Mother specify what time frame she is referring to, or whether she is referencing Father's conduct concerning the consent to adopt.

21

Plaintiff Mother's statement in paragraph 2 is simply a self-serving conclusion without any supporting evidence from the record. Therefore, the court submits that paragraph 2 of Plaintiff Mother's Statement is inadequate to merit appellate review, and Plaintiff Mother has waived any alleged error by the court. Pa.R.A.P. 1925(b)(4)(vii).

> "3. The Trial Court abused its discretion in failing to award to Mother primary physical custody in light of the improper conclusions drawn as to Custody Factors 1, 8, and in failing to properly weigh and consider factors 2,11 and 13 of 23 Pa.C.S.A. §5328(a)."

23 Pa.C.S.A §5328(a) lists the factors which the court must consider when awarding any form of custody. Subsection(a)1) states that the court must consider "which party is more likely to encourage and permit frequent and continuing contact between the child and another party. 23 Pa.C.S.A. 5328(a)(1). Subsection (a)(8) states that the court must consider "the attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm." 23 Pa.C.S.A. 5328(a)(8). 23 Pa.C.S.A. §5328(a)(2) states that the court must consider "the present and past abuse committed by a party or member of a party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." 23 Pa.C.S.A. 5328(a)(2). 23 Pa.C.S.A. 5328(a)(11) states that the court must consider "the proximity of residences of the parties." 23 Pa.C.S.A. 5328(a)(11). 23 Pa.C.S.A. 5328(a)(13) states that the court must consider "the level of conflict between the parties and the willingness and ability of

22

Circulated 12/10/2014 04:19 PM

the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party." 23 Pa.C.S.A. 5328(a)(13).

Plaintiff Mother's statement as to the custody factors under 23 Pa.C.S.A. 5328(a)(1) and (a)(8) is repetitive of her claims made in paragraphs 1 and 2 above which the court has previously addressed. Furthermore, Plaintiff Mother does not specify in what way the court abused its discretion in regard to 23 Pa.C.S.A. 5328(a)(1),(2),(8), (11), or (13), or what specifically are the "improper conclusions" drawn by the trial court. Plaintiff Mother's statement as to custody factors under subsections (a)(1),(2), (8), (11), and (13) is simply a general declaration that the court failed to properly consider these factors without any specific reference to the evidence of record to support her claim. Therefore, the court submits that paragraph 3 of Plaintiff Mother's Statement is inadequate to merit appellate review, and Plaintiff Mother has waived any alleged error by the court. Pa.R.A.P. 1925(b)(4)(vii).

Plaintiff Mother's statement fails to specify in what way the court abused its discretion, and Plaintiff Mother fails to refer to any evidence from the custody trial to support her general claims. As previously stated in this opinion, the transcripts of ten (10) out of fifteen (15) days of trial were docketed prior to Plaintiff Mother filing her appeal permitting Plaintiff Mother to support her conclusionary statements with some supporting references from the trial record had she chosen to do so. The court submits that Plaintiff Mother's Statement is inadequate to merit appellate review, therefore, Plaintiff Mother has waived any alleged error by the court and her appeal should be dismissed pursuant to Pa.R.A.P. 1925(b)(4)(vii).

23

Second, the court addresses Defendant Father's claims as follows:

> "1. The Trial Court committed prejudicial error in excluding evidence offered by Cross-Appellant, including but not limited to evidence concerning how Mother raised and cared for her son (not the child at issue in this case), the medical care (or lack thereof) provided to her son, child care decisions for her son, and all other evidence concerning Mother's son."

Plaintiff Mother testified at the March 25, 2013 hearing that she is also the mother of J.G, her son who was seven years old at the time of the hearing. J.G's son's Father is not the Defendant Father in this case, and J.G. was not the subject of this custody case. Despite Defendant Father's claim that the court excluded "all other evidence" concerning Plaintiff Mother's care of her son, Plaintiff Mother testified as to G.D's sibling relationship with J.G, the childcare arrangements she has made for her son, his schooling, his relationship with her family, and his lack of contact with his biological Father.

In considering the best interests of the child in a custody hearing, the court must consider both parents' ability to care for the child, and to make child care decisions for the child. However, the parent's ability to provide the necessary care for the child must be determined at the time of the hearing. Bresnock v. Bresnock, 346 Pa.Super. 563, 500 A.2d 91 (1985), Michael T.L v. Marilyn J.L., 363 Pa.Super. 42, 525 A.2d 414 (1987)("A parent's ability to care for the child is to be determined as of the time of the custody hearing, and, in making its decision, the trial court must not dwell on matters buried in the past, but most concentrate only on those matters which affect the present and the future of the child.") Plaintiff Mother's son was not the subject of this custody case, and there was no proffer of any relevant information as to J.G. which the court should have considered with regard to the

24

child. Based on the testimony presented at trial, both parents have contributed to the lack of communication which has existed between them. Defendant Father's claim that the court erred in not finding that Plaintiff Mother was responsible for the lack of communication, and, therefore, she would be unable to "permit and encourage frequent and continuing contact" is misplaced. "A minimal degree of cooperation between parents which is a factor the trial court must consider in determining whether to award parents shared custody of children does not translate into a requirement that the parents have an amicable relationship". B.C.S.v. J.A.S.994 A.2d. 600 (2010) PA.Super.63.

There was testimony from both parties that they and their families have participated in disturbances during the custodial exchanges of the child, and that both parents, and their families, have contributed to the "chaotic" atmosphere that occurred at several of these meetings. Defendant Father's claim that the court abused its discretion in not finding that Plaintiff Mother, and her family, were responsible for the "chaotic events" at these exchanges, and, therefore, Plaintiff Mother would be unable to "permit and encourage frequent and continuing contact" is without merit.

There was no credible evidence presented at the custody trial that Plaintiff Mother attempted to bring "false abuse charges" against Defendant Father. Because the court is unclear if Defendant Father is referring to allegations of abuse made by Plaintiff Mother involving herself or G.D., the court addresses both issues herein. The court also notes that in his statement or errors, Defendant Father does not specify any dates or specific instances when Plaintiff Mother is alleged to have attempted to bring "false abuse charges" against him.

26

The protection from abuse petition filed by Plaintiff Mother in Montgomery County on May 16, 2011, and the temporary order which was issued as a result of the petition, were stricken by Judge Wall as part of the temporary custody agreement reached by the parties on May 27, 2011 without any findings of fact. There was no credible evidence at the custody trial, or finding by the court, that Mother lied repeatedly about allegations of abuse by Defendant Father towards her, or that she tried "to use it to her advantage before the Trial Court."

Plaintiff Mother did testify that after Defendant Father accused Plaintiff Mother of somehow burning G.D.s mouth, she contacted Children and Youth Services. Plaintiff Mother testified that she contacted the agency because "I was very concerned. I knew I hadn't burnt her mouth.." N.T. March 25, 2013 at 236. Plaintiff Mother testified that Defendant Father refused to give her any information about G.D.'s doctors at that time, so she could not contact G.D.s doctor about the child's burnt lip. Plaintiff Mother stated "...I thought maybe I could get some answers if they got involved...I knew they would have to contact [G.D.'s] doctor at least, and I could rest knowing that...she was being looked at..." N.T. March 25, 2013 at 236-237. There was no credible evidence presented that Plaintiff Mother contacted Children and Youth Services to file "false abuse charges" against Defendant Father. Plaintiff Mother testified that she called Children and Youth because she was worried about allegations Defendant Father was making towards her, and because she was concerned about G.D.

Dr. Thomas Damiano testified that in February, 2013, Plaintiff Mother brought G.D. to be examined into the Doctor's Express office in Wilmington, Delaware where he worked. Dr. Damiano testified that Plaintiff Mother was

27

initially concerned that "two lesions" on G.D.s face and on G.D.s ankle could potentially be signs of abuse. N.T. August 9, 2013 at 31. Dr. Damiano testified that after examining the child, he told Plaintiff Mother that he did not think the marks were the result of abuse, but that due to Plaintiff Mother's statement to him about her concerns of potential abuse, he would have to "due my due diligence and call Child Protective Services.." N.T. August 9, 2013 at 35. Dr. Damiano did not testify that Plaintiff Mother asked him to report to authorities, and he did not testify that Plaintiff Mother raised any abuse allegations specifically against Defendant Father. In fact, when asked by Defendant Father's counsel, Ms. Agnew: "Was she adamant about reporting it?", Dr. Damiano replied: "She was not adamant about reporting it, but just if anyone brings up abuse we are just obligated to report it." N.T. August 9, 2013 at 38. There was no credible evidence presented that Plaintiff Mother brought the child to Doctor's Express that day in order to file "false abuse charges" against Defendant Father.

Defendant Father's claim that the court abused its discretion in finding that Plaintiff Mother would be able to "permit and encourage frequent and continuing contact" is not based in fact or on any credible evidence presented at trial and his claim should be dismissed.

> "3. The Trial Court abused its discretion in finding that there is no continued risk of harm to the child by Mother or by any member of Mother's household, given the overwhelming evidence to the contrary, including but not limited to, a) the repeated and excessive bruising and other injuries (i.e., burned lips, black eye) suffered by the child while in Mother's care, b) the numerous rashes and illnesses suffered by the child as a result of being in the care of Mother, c) the behavior of the child after returning from Mother's care such as hitting, head butting, cursing, and problems with sleep, and d)

28

the evidence that Mother was oblivious about the child's fevers, bruising, injuries, and illnesses."

There was extensive testimony by both of the parties as to minor injuries such as occasional bruises, isolated rashes, a burnt lip, colds, and one instance of hand, foot and mouth disease which the child has had over two and half years. Although the child was taken on several occasions by both parents to doctor's offices and emergency rooms, none of these alleged injuries, rashes, or colds were ever categorized by the physicians who testified as anything other than minor. No evidence was presented by either party as to the definitive source or cause of these minor bruises, rashes, colds, or the child's burnt lip. Defendant Father's claims that the child's colds, rashes, and bruises, and burnt lip were the "result of being in Plaintiff Mother's care" is not based in fact or on any evidence presented at trial. In fact, at the time these bruises, rashes, colds and the child's burnt lip occurred, no allegations of abuse by Plaintiff Mother were made by Defendant Father to any investigative agency. Additionally, the court notes that from February 27, 2011 until and through the time of trial, Defendant Father had almost total physical custody of the child with the exception of two (2) forty eight (48) hour periods a month when Plaintiff Mother had custody of her. To allege that unexplained bruises, rashes, colds, or a burnt lip were solely the result of the care the child was receiving from Plaintiff Mother when Defendant Father had custody the greatest majority of the time, is misplaced.

There was testimony at the trial from both parents, as well as other witnesses, that the child is doing well emotionally, physically, and developmentally. There was no credible evidence presented that demonstrated that the child's occasional emotional outbursts, temper tantrums, or occasional

29

hitting were anything more than typical behavior of a two year old child, a toddler. There was no evidence presented that Plaintiff Mother's care or treatment of the child was the source or cause of any negative behavior exhibited by the child.

Plaintiff Mother testified as to the numerous times she has contacted doctors or sought medical help when the child was sick or injured, and, the care she administered to the child when she was sick or hurt. Her testimony was corroborated by other witnesses, including, pediatricians who testified. The testimony at trial is in direct contradiction to Defendant Father's statement above that Plaintiff Mother was "oblivious" to the child's medical conditions. Indeed, defendant father's alternate argument as discussed prior hereto in 2. is that Plaintiff Mother brings false charges against Defendant Father based on the child's medical condition.

For the above stated reasons, the court did not abuse its discretion in finding that there is no risk of harm to the child by Plaintiff Mother. Therefore, Defendant Father's claim is without merit and should be dismissed.

> "4. The Trial Court abused its discretion in finding that Mother has provided the necessary care of the child while in Mother's custody, in light of the overwhelming evidence to the contrary, including but not limited to, a) Mother's failure to provide proper medical care for the child during the first two months of her life and at other times, and b) Mother's failure to properly care for or supervise child resulting in excessive bruising and other injuries to the child and illnesses suffered by the child."

Plaintiff Mother testified that from the child's birth on December 28, 2010, until February 27, 2011 when Defendant Father took the child to his home, she provided for the child's daily care. She fed her, changed her diapers, put her down

30

for naps, bathed her, and took her to the doctor. N.T. March 25, 2013 at 90. Plaintiff Mother stated that she called the doctor "all the time...any little thing, a skin irritation or a runny nose, I was calling the doctor and asking, because...I wanted her to be happy and comfortable." N.T. March 25, 2013 at 90. When asked by her counsel, Ms. Sattin, if she took the child for vaccinations, Plaintiff mother replied: "She wasn't due for shots, until after E.D. took her. At two months, she's due for shots...she had her initial shots in the hospital, and then you get them again at two months." N.T. March 25, 2013 at 91. There was also testimony presented from the pediatrician who treated the child during her first six months that according to his office's treatment schedule for newborns, the child missed one vaccination and one check-up according to his office's treatment schedule for newborns. N.T. August 12, 2013 at 22. The pediatrician also testified that despite Plaintiff Mother missing the child's one-month checkup, Plaintiff Mother called the pediatrician at least four times with questions and concerns about the child. Additionally, Defendant Father testified that while the child was living with Plaintiff Mother for the first eight weeks of her life, he never called Children and Youth Services or the police over concerns for the care and safety of the child, and, in fact, the only concern he did have was that the child "seemed to be a little bit thin." N.T. June 5, 2013 at 113-114.

Plaintiff Mother testified about her feeding of the child, childcare arrangements, and the medical care she provided for the child as she grew older. Plaintiff Mother also testified that when she picked up the child for her periods of partial custody, on several occasions, she was immediately concerned about the child's health, and, on one occasion, took the child directly to an urgent care facility

31

in Wilmington, Delaware on the way home from the custodial exchange. N.T. March 25, 2013 at 235.

There was no credible evidence presented by Defendant Father that Plaintiff Mother failed to provide for the proper medical care of the child at any time, or that Plaintiff Mother has failed to provide for the daily physical and emotional needs of the child while the child has been in her custody. As previously stated above, there was no credible testimony, much less "overwhelming evidence" presented by Defendant Father that Plaintiff Mother failed to exercise proper supervision or care of the child which led to the child getting bruised or catching colds. Defendant Father's claim is not supported by the evidence which was presented at trial, and, therefore, his claim is without merit and should be dismissed.

> "5. The Trial Court abused its discretion in finding no credible evidence that Mother has attempted to turn the child against Father, given the overwhelming evidence to the contrary, including but not limited to, a) Mother's website, Facebook pages, and other online presences, and b) Mother's media coverage both online and on television, that all set forth false and untrue statements about Father, and disclosed confidential Orphan's Court matters, which portray Father in an extremely negative light and which child will be able to see as she gets older and is able to read and get online."

There was testimony presented at trial that Plaintiff Mother published the details of her custody dispute with Defendant Father on a website, and, a video presented that she gave interviews to news organizations as well. While it can be argued that this behavior may not be advisable, there was no evidence presented at trial that Plaintiff Mother did so with the intention of turning the child against Defendant Father. Plaintiff Mother testified that "I wanted the story out there so

32

[the child] would know her mother fought for her...I also thought this would help my case." N.T. June 3, 2013 at 258 and 260. At the time of the 2013 trial, the child was two years old. Therefore, Defendant Father's claim that statements which Plaintiff Mother posted on the internet or that she made in interviews were designed to turn the child against Defendant Father are not credible as the child could not read, or, comprehend the full ramifications of the custody dispute. Defendant Father's statement that Plaintiff Mother's behavior will impact the child when she is older "and able to read and get online" is speculative in relation to the best interests of the child at this time, which is the relevant period of time for the court to evaluate. Therefore, Defendant Father's claim is without merit and should be dismissed.

> "6. The Trial Court abused its discretion in finding that the child is doing well physically and emotionally while under the care of Mother and in finding that Mother is able to attend to the daily physical, emotional, developmental, educational and special needs of the child in light of the overwhelming evidence to the contrary, including but not limited to, a) the repeated and excessive bruising and other injuries (i.e. burned lips, black eye) suffered by the child while in Mother's care, b) the numerous rashes and illnesses suffered by the child as a result of being in the care of Mother, c) the behavior of the child after returning from Mother's care such as hitting, head butting, cursing, and problems with sleep, , d) the evidence that Mother was oblivious about the child's fevers, bruising, injuries and illnesses, e) Mother's failure to provide proper medical care for the child during the first two months of her life and at other times, f) Mother's failure to properly care for or supervise child resulting in excessive bruising and other injuries to the child and illnesses suffered by the child, and g) Mother's instability in where she lives, insufficient sleeping arrangements for the child at Maternal Grandmother's home, her many boyfriends, her job history, problems with her brother (and his criminal,

33

violent and drug history) and problems with Mother's son's Father (and his criminal and violent history)."

Defendant Father's claims in paragraph 6, sections a) through f) have previously been addressed by the court in this opinion, and for the previously mentioned reasons, they should be dismissed as having no merit. Defendant Father's claims that Plaintiff Mother has unstable living arrangements and insufficient sleeping arrangements for the child are equally without merit.

Plaintiff Mother testified that she lives with her Mother, P. G            , in Plymouth Meeting, Pennsylvania. Maternal Grandmother testified that she does not have a criminal record, or any history of mental health issues, or drug and alcohol abuse. N.T. June 4, 2013 at 194. Plaintiff Mother testified that if she were to regain full custody of the child, the child would have her own bedroom while living at maternal grandmother's house. Plaintiff Mother, and her current boyfriend, K. P        , both testified that they were planning on living together at Mr. P   's home in Elverson, Pennsylvania following the custody litigation. The child would have her own bedroom, and has toys, a large yard, and a swing set at Mr. P   's house. Plaintiff Mother and Mr. P    had been dating approximately a year and a half at the time of the custody trial. Mr. P    testified that he is employed as a banker, and is also involved in real estate and small business investment. The testimony presented at trial shows that Plaintiff Mother does not have an unstable or insufficient living arrangements for the child. Therefore, Defendant Father's claim is without merit and should be dismissed

There was no evidence presented at trial to support Defendant Father's claim that Plaintiff Mother had "many" boyfriends since G.D. was born, or that the number of Plaintiff Mother's boyfriends has had any negative effect on the child, or

34

her best interests. Similarly, there was no evidence that Plaintiff Mother's job history has had any negative effect on the child. Plaintiff Mother testified that she quit her job at the "massage parlor" prior to the child's birth. Furthermore, Plaintiff Mother's past conduct in relation to her dating history or her employment should not significantly factor into the court's decision as to the best interest of the child as long as the child is not negatively impacted. "Without evidence of a harmful effect on the child, a parent's past conduct should have little weight in the court's custody decision." Michael T.L. v. Marilyn J.L., 363 Pa.Super. 42, 525 A.2d 414 (1987); see also V.B. v. J.E.B., 55 A.3d 1193, 2012 PA Super 200 (2012)(holding trial court erred by invoking Father's prior participation in a nontraditional sexual practice as grounds for awarding custody of children to grandparents.). Therefore, Father's claims as to Plaintiff Mother's dating and employment history are without merit and should be dismissed.

Defendant Father's claim that Plaintiff Mother has "problems" with her brother and "problems" with the Father of her son which would warrant denying her custody of the child are not based on any evidence presented at trial. Plaintiff Mother specifically testified that at the time of trial, she did not have any recent contact with her brother or her son's Father. Defendant Father does not state specifically what "problems" he is referring to, and how these alleged "problems" negatively impact on the child. Defendant Father's claim is nonspecific and without merit, and should therefore be dismissed. Counsel for Defendant Father was counsel for the entire trial for defendant Father. Therefore, more specific claims should have been made in his Pa.R.A.P.1025 (b) statement of errors.

35

"7. The Trial Court abused its discretion in failing to award Father primary physical custody of the child for the aforementioned reasons and the improper conclusions drawn as to the custody factors 1,2,3,4,8,10 under 23 Pa.C.S.A. § 5328 (a)."

Defendant Father's claims in paragraph 7 of his statement of errors are repetitive of the issues he raises in paragraphs 1 through 6 of his statement. As previously stated by the court, Defendant Father's claims in paragraphs 1 through 6 are meritless and should be dismissed.

"8. The Trial Court abused its discretion in failing to properly weigh and consider custody factors 11 and 13 under 23 Pa.C.S.A. § 5328(a) when entering its Order, given that the parties live at least 1 and ½ hours apart and that this has been such an extremely high-conflict case."

Defendant Father does not specify how the court abused its discretion or failed to properly weigh and consider custody factors 23 Pa.C.S.A. § 5328(a)(11) or (13). Defendant Father also does not specify how the distance between the parties' residences or the fact that he terms this case "high-conflict" bear on the court's determination as to the best interest of the child. Therefore, the court submits that paragraph 8 of Defendant Father's Statement is inadequate to merit appellate review, and the Defendant Father has waived any alleged error by the court. Pa.R.A.P. 1925(b)(4)(vii).

The court notes that, in reaching a decision as to custody of the child, the court took into consideration the level of conflict between the parties pursuant to 23 Pa.C.S.A. § 5328(a)(13) when issuing its Order. On Page 6 of the September 26, 2013 Order, the court states that "the Court does find that there is a level of conflict between the parents. The Court addresses this conflict below." Pursuant to

36

that finding, Page 10 of the September 26, 2013 order requires the parties to attend co-parenting counseling and are to continue with counseling " until such time as the counselor deems it no longer necessary, or, until further order of the Court."

If there is an optimum time to stop their disagreements, the time is now. As the court stated in its order, the child at the time of the orders was 2 ¾ years old. It is difficult for the court to order the parties to think in a certain way, but the order for the parties to follow of September 27, 2013 is in G.D.'s best interests. G.D.'s best interests are what the court has considered and so should her parents.

> "9. The Trial Court abused its discretion in failing to enjoin Mother from disclosing the details of the Adoption and Custody matters on the internet, to the media or to any person or entity not associated with the Custody or Adoption matters, in light of the overwhelming evidence that it would not be in the child's best interest, as much of what Mother disclosed or published were false and untrue statements about Father, and disclosed confidential Orphan's Court matters, which portrayed Father in an extremely negative light. Mother also had future plans for more media and a movie deal, in which child's life would be exposed for all to witness."

The court previously addressed Plaintiff Mother's posting of information on the internet and to the news media as stated above under 5 of Defendant Father's issues. Defendant Father provides no authority to support his claim that the court is permitted to enjoin Plaintiff Mother from exercising her right of free speech First Amendment rights, and provides no supporting evidence to support his claim that Mother's conduct has negatively affected or will negatively affect the best interests of the child. In addition, Plaintiff Mother testified that she does not have a movie

37

deal pertaining to the custody or adoption cases, and that "..I'm not in the media anymore. I've decided not to do that." N.T. June 3, 2013 at 290. When asked by Ms. Agnew: "...once this is over...and there is a ruling...you plan to go forward with more media coverage?", Plaintiff Mother replied: "Probably not, no. I don't plan on it, no. Not at all." N.T. June 3, 2013 at 291.

There was also evidence presented at trial that Defendant Father's sister, A.    W.    , started a website and also posted information about the adoption and custody cases, including negative statements made about Plaintiff Mother. The future impact on the child of reading statements made on either website is speculative now, although, as previously noted by the court, such behavior is unadvisable by either party or their families. However, based on Plaintiff Mother's testimony that no movie deal or further media coverage was forthcoming, and no evidence to the contrary being submitted by Defendant Father, the court did not abuse its discretion in not "enjoining" Plaintiff Mother from pursuing what amounts to speculative endeavors.

Plaintiff Mother and Defendant Father's claims as raised in their 1925(b) statements are without merit, and are not supported by the evidence presented at trial.

For the above stated reasons, the court respectfully requests that Plaintiff Mother's appeal be dismissed, Defendant Father's cross-appeal be dismissed, and the September 27, 2013 order be affirmed.

**BY THE COURT:**

**PATRICIA E. COONAHAN, J.**

38

Circulated 12/10/2014 04:19 PM

Copies of the above Opinion sent
on              to the following:
**By First-Class Mail:**
Sheryl Rentz, Esquire
Deirdre Agnew, Esquire


Secretary